## THE NEW YORK IRON MINE v. THE CITIZENS' BANK.

*Post dated drafts—Agent's authority to draw unusual negotiable paper—
Bills of exchange—Burden of proving execution—
Notice of equities—Local usage.*

Where defendant in an action on a bill of exchange drawn by his agent,
pleads the general issue, and files with it an affidavit denying the exe-
cution of the bill, the plaintiff has the burden of proving that it was
drawn with competent authority.

The authority of an agent in charge of an iron mine to draw post-dated
bills of exchange on his principal was not presumed from his having
done so before without objection, where there was nothing to show
that the party relying on his authority knew the fact, and a long inter-
val had passed since it occurred, and the mine had meanwhile become
prosperous and better supplied with ready money, and where in the
former case the bills were drawn on time and were post-dated only
long enough to give the drawee the benefit of the full period of dis-
count after receiving them, while in the latter they were made pay-
able at sight, and post-dated several weeks for the agent's private
advantage.

Where knowledge of circumstances that would excite suspicion in the
mind of a prudent man on becoming the transferee of negotiable
paper is not enough to affect the paper in his hands with pre-existing
equities, he must have had actual notice of such equities, or, at least,
knowledge of such facts and circumstances as would have made his
taking the paper with the intention of enforcing it an act of bad
faith.

Parties discounting paper drawn by an agent upon his principal, are
bound to act in the light of all facts within their knowledge bearing
on his authority, and cannot disregard any fact which might lead a
prudent man to suspect that the agent is acting in fraud of his prin-
cipal.

Local usage can affect the general rules of mercantile and banking law
only to a very limited extent, and under circumstances in which the
usage must be considered as made by a party a part of his contract.

A post-dated draft purporting to be payable at sight, is, for all the legal
purposes of presentment, demand, protest and payment a draft pay-
able so long after date ; but that authority to make time paper shall
be held to cover post-dated paper, their legal effect must not only be
the same, but all their incidents so far identical, that both may fairly
be supposed to have been in mind when the authority was given.

Authority to an agent to give unusual business paper is not to be construed on technical reasoning but on the actual intent.

A post-dated bill of exchange differs from a bill made payable a corresponding period after it is drawn, in that the time bill may be sent forward meanwhile for acceptance, while the post-dated bill cannot, and the drawee cannot retain funds to meet it before its date as against other bills previously falling due.

An agent's authority to draw bills of exchange payable on time or at sight, does not include authority to draw post-dated bills.

Error to Marquette.   Submitted June 15 and 16.   Decided October 13.

Assumpsit.   Defendant brings error.   Reversed.

*W. P. Healy* and *A. B. Maynard* for plaintiff in error. An agent's authority to make one kind of paper does not empower him to make another : 1 Pars. N. & B. (2d ed.) 107; *Trip v. Swanzey Mfg. Co.* 13 Pick. 293; *Robinson v. Yarrow* 7 Taunt. 455; *Attwood v. Munnings* 7 B. & C. 278; *Wallace v. Branch Bank* 1 Ala. 565; *Union Bank v. Mott* 39 Barb. 180; *Mechanics Bank v. Schaumburg* 38 Mo. 236; *Batty v. Carswell* 2 Johns. 48; *Floyd's Acceptances* 7 Wall. 666; authority to make post-dated drafts cannot be implied from the fact that they had been made before without objection under different circumstances: *Beach v. Vandewater* 1 Sandf. 277; *Dickinson v. Valpy* 10 B. & C. 128; the right to draw checks does not carry the power to post-date them : *Foster v. Mackreth* L. R. 2 Exch. 163; post-dated drafts are due on and after the day of their date : *Pasmore v. North* 13 East 517; *Mohawk Bank v. Broderick* 13 Wend. 134.

*Dan. H. Ball* and *Ashley Pond* for defendant in error. Post-dated drafts are not illegitimate or suspicious: 1 Dan. Neg. Inst. 73–4; 2 id. 538; Edwards on Bills 151; *Brewster v. McCardell* 8 Wend. 478; bills of exchange need not bear any date : Pars. N. & B. 41–2.

Cooley, J.   The Citizens' Bank is a corporation doing business at Marquette, Michigan, and was organized for that

purpose in May, 1871. The New York Iron Mine is a corporation, organized under the laws of Michigan in or about the year 1865, for carrying on mining operations near Marquette, but having the business offices of its president, secretary and treasurer in the city of New York. In the circuit court the bank sued the mine to recover the amount of the following bill:

"OFFICE OF THE NEW YORK IRON MINE,
"MARQUETTE, LAKE SUPERIOR, July 5, 1877.

" At sight, acceptance waived, pay to order of F. M. Steele, cash, five thousand dollars.      NEW YORK IRON MINE.
"By W. L. Wetmore.
"To *Saml. J. Tilden Esq.*, 12 Wall St. N. Y."
" $5000."

The defendant pleaded the general issue, and filed an affidavit denying the execution of the bill. This plea and denial imposed on the plaintiff the necessity of proving that the draft was drawn by Wetmore with competent authority. The evidence which was given for this purpose is set forth in the bill of exceptions. It appears from this that at the organization of the defendant corporation Samuel J. Tilden and William L. Wetmore were the principal stockholders, and after a time, perhaps, the sole stockholders; that Tilden was president and also acted as treasurer, and Wetmore was general agent and manager at the mine; that the directors, besides Tilden, were men in his employ, and the board met but seldom, and the management of financial matters at New York was left exclusively to Mr. Tilden; that Wetmore while acting as general agent for the mine, was also operating on his own account in company with a brother under the firm name of Wetmore & Bro., and also as a proprietor in the Bay and Munising Furnace Companies. As the sales of products of the New York Iron Mine were made under Mr. Tilden's direction, and the moneys received went into his hands at New York, the means of carrying on mining operations were obtained by Wetmore by means of drafts drawn by himself on Mr. Tilden, which were either discounted at Marquette or Negaunee or sent forward for collection. At

first these seem to have been principally time drafts, but the mine proved to be very profitable, and after 1872 the drafts were generally at sight.   In 1869 four post-dated drafts were drawn by Wetmore, the first of which was drawn seven days before its date, the second four days, the third five days, and the fourth nine days.   In each instance Mr. Tilden was advised of the drawing by letter on the day the drafts were made, and it does not appear that any objection was made by him to their being post-dated.   The first and fourth were drawn in January and December.

It was shown by Wetmore and not questioned by any one that the draft in suit together with a large amount of other paper was drawn by Wetmore for his own purposes without the knowledge of Mr. Tilden.   The circumstances under which it was taken by the bank are shown by the testimony of Mr. Steele, the cashier of the bank.   It appears by his evidence that the following post-dated drafts purporting to be sight drafts, were drawn by Mr. Wetmore and discounted at the bank: one for $5000, dated May 6, 1876, discounted April 29th; one for same amount dated August 5, 1876, discounted July 15th; one for same amount dated November 2, 1876, discounted October 23d; one for same amount dated December 4, 1876, discounted November 8th; one for same amount dated February 8, 1877, discounted January 6th; one for same amount dated March 3, 1877, discounted February 9th; one for same amount dated May 12, 1877, discounted April 9th.   All these when their respective dates arrived were forwarded to New York and were paid.   There is no evidence that Mr. Tilden knew before paying them that any one of them was a post-dated draft, and he testified that he never did.   Wetmore also drew and the bank discounted for him May 23, 1877, a draft post-dated June 3d. This was not forwarded, but was taken up by Wetmore June 7th, by another draft post-dated July 3, which the cashier was requested not to forward.   The reason assigned by Wetmore for thus taking it up was that he had had a fire at the Bay Furnace location, which demanded all his attention for the time, and he could not then make up his New York

accounts. The draft in suit was discounted by the bank June 16, 1877, post-dated July 5. With this was given a draft dated June 16, 1877, payable July 8, for a like amount, which was considered as collateral. The giving of the collateral draft appears to have been at Wetmore's suggestion, on a supposition, as he explains it, that if he were to die before the date of the principal draft arrived, it would become invalid. Similar collateral time drafts had been given in other cases where post-dated drafts had been discounted.

In all cases but one in which Wetmore obtained discounts at the bank, on paper purporting to be that of the New York Iron Mine, the money was paid or credited by the bank to him. The exception was of the draft in suit the proceeds of which, by Wetmore's direction, were credited to the mine, but were almost immediately drawn out on his checks. It was shown that a portion of the proceeds was paid out on the pay roll of the mine, but Wetmore, who was a witness for the plaintiff, admitted that this was in place of money belonging to the mine which he had used for his own purposes. The mine never had any other account with this bank.

The cashier of the bank testified that while discounting post-dated paper he did not regard it as suspicious; that discounting such paper was common with the banks in that part of the country. He was asked how it was elsewhere, but was not permitted to answer. He also testified that he did not look upon it as suspicious that he was requested not to forward the post-dated paper.

Immediately on the bill in suit being discounted Wetmore started for New York, where he had an interview with the secretary of the mine and with Mr. Tilden. To them he presented a statement of paper issued improperly by him in the name of the New York Iron Mine, and which he endeavored to induce them to assume for the corporation. The amount was $63,933.84, of which he had charged to himself $49,005.14 on the corporate books. Previous to going there he had counseled with a leading lawyer at Marquette, and been assured that he was not liable criminally for

these issues, but he did not in New York attempt to justify or excuse his conduct. Mr. Tilden refused to recognize the paper in any way, and denied the liability of the corporation upon it. Included in the statement was the draft in suit, and the one dated July 3d, and also two notes of $5000 each discounted by the same bank.

The foregoing is a very brief and much condensed statement of the principal facts upon which the legal questions depend. The evidence leaves upon our minds no doubt upon the following points:

Mr. Wetmore from the first had ample authority to draw bills in the name of the New York Iron Mine on Mr. Tilden, who acted as its treasurer, either at sight or on time, as the wants or convenience of the corporation should dictate, or as its circumstances should appear to render most desirable. But he had no express authority to execute for the corporation negotiable paper of any other description for the purposes of discount.

If Wetmore had implied authority to give post-dated bills, it must be either because he had drawn several such bills in 1869 which had been paid without protest with full knowledge, or because, as it was contended on behalf of defendant in error, a post-dated bill purporting to be payable at sight, is the same in legal effect with a bill dated when drawn and payable at a future day, so that authority to draw the one includes authority to draw the other also.

Of the fact that the bills which Wetmore drew in 1876 and 1877 were post-dated, Mr. Tilden and the other corporate officers in New York had no knowledge, and it was not intended by Wetmore that they should have. There was no corporate necessity or corporate reason for drawing them in that form, and it was done improperly for the benefit of Wetmore, and with the intent that when the bill reached New York it should be supposed they were just drawn. None of the bills were sent forward by the bank for acceptance, and the circumstances suggest the inference that there was at least an implied understanding between the bank and Wetmore that the parties in New York would not be notified

that the paper was post-dated. Both the cashier and Wetmore testify to the request of the latter that the draft of July 3d should be retained until that date arrived, and there is scarcely room for doubt that Wetmore understood all this post-dated paper was being kept back in the same way. It is not important to know whether there was or was not any agreement to that effect : the significant facts were that Mr. Tilden when paying drafts would not be apprised that they were post-dated, and that those handling the paper had no reason to suppose he would be.

Upon the foregoing-statement it would seem indisputable that if a post-dated bill is to be treated and considered in all respects like a bill payable at a certain time after it is drawn and dated, then Wetmore had authority to draw the paper in suit. But if it is to be considered and treated as paper so different as to require special authority for an agent to execute it, we doubt if there is any evidence in this case that tends to show Wetmore had such authority. We do not overlook the post-dated drafts issued in 1869 ; but in determining their importance as evidence the following circumstances are to be considered : (1) The great lapse of time. It was conceded on all hands on the trial that the condition of the mine had greatly changed prior to 1876, and it had become and was understood to be a prosperous corporation with abundant means. The presumption that an authority existing in 1869 to make unusual paper was still in force seven or eight years later after a considerable change in circumstances would certainly not be very strong or forcible. (2) The drafts made in 1869 were essentially different from the post-dated bills of 1876–7. The former were all payable at either 30 or 60 days after date, and were post-dated only four and five days in the summer and seven and nine days in the winter months. Compared with the time they had to run this post-dating was not very significant ; it was in fact little more than the time that would be required for transmitting the paper from Marquette to New York and for presenting it, and perhaps the purpose was that the dating should correspond to the time when the paper would be likely to reach

the office in New York, instead of to the time of negotiation. If post-dated paper was unauthorized so slight an irregularity might well have been overlooked, even if notice had not been promptly given of the drawing of the bills, as seems to have been the case with the paper of 1869. It is not readily perceived that the post-dating in those cases could have been in itself important for any purpose, and the form was probably adopted merely as a convenient one whereby Mr. Tilden in New York would be given the full thirty or sixty days after advice in which to provide for the paper. On the other hand the paper of 1876–7 was for the most part post-dated much longer; it was besides payable at sight so that the period of post-dating would be the whole period of discount. There was no notification of its issue until it was sent forward when the day of its date arrived, so that it was well calculated to subserve fraudulent purposes as it actually did in this case. It was only necessary for Wetmore to refrain from notifying the New York office, and he might then have the benefit of the corporate credit for the purposes for which he had not been empowered to use it, to the full amount of such post-dated paper as he should see fit to draw, and for such time, longer or shorter, as he should post-date it. We cannot in view of all these differences say that much support for the bills of 1876–7 can be drawn from the payment without protest of the bills of 1869. But (3) the bank had no connection with the bills of 1869: it does not appear that any of the officers of the bank ever knew of them; they were drawn, as the dates before given will show, sometime before the bank had an existence. This is important as it bears upon the claim of the bank that they had a right to suppose from appearances and from Wetmore's management of the business that his power was ample.

On this subject, also, the circumstances attending the drawing and sending forward of this paper are important. It was said on the argument that there is nothing suspicious in the circumstance that a bill is post-dated; nothing that puts the purchaser upon inquiry. The legal authority for this is to be found—if anywhere—in *Brewster v. McCardell*

8 Wend. 478, where SUTHERLAND, J., says: "There is no legal objection either to antedating or post-dating a note, and I am not prepared to say that either is, in itself, and disconnected from other circumstances, a legal ground of suspicion, so as to put the endorsee upon inquiry, and subject him to all the equities existing between the original parties." This cautious statement, that the post-dating, as a ground of suspicion, fell short of charging the indorsee with equities existing between the original parties, has doubtless by inadvertence been converted by one text-writer into a positive asseveration that the fact that a bill or note is negotiated prior to the day of date "is not a suspicious circumstance against which parties must guard." 1 Daniell Neg. Inst. § 85. But the difference between a merely suspicious circumstance, and such "legal ground of' suspicion" as will charge an endorsee with equities existing between the original parties is so great that we need not fall into confusion here. The same text-writer in his valuable treatise has carefully collated the adjudged cases to show that the decided weight of authority in this country, and the settled law in England is, that mere knowledge of circumstances that would excite suspicion in the mind of a prudent man at the time he becomes the transferee of negotiable paper, is not sufficient to affect the paper in his hands with pre-existing equities. 1 Daniell Neg. Inst. §§ 770–776. To charge the transferee with such equities he must have had actual notice of them, or at least, he must have had knowledge of such facts and circumstances as would have made his taking the paper with the intention of enforcing it an act of bad faith. *Goodman v. Simonds* 20 How. 343; *Murray v. Lardner* 2 Wall. 100; *Phelan v. Moss* 67 Penn. St. 62; *Hamilton v. Vought* 34 N. J. 187; *Magee v. Badger* 34 N. Y. 247; *Crosby v. Grant* 36 N. H. 273; *Farrell v. Lovett* 68 Me. 326; *Commercial etc. Bank v. First Nat. Bank* 30 Md. 11; *Spooner v. Holmes* 102 Mass. 503; *Matthews v. Poythress* 4 Ga. 287; *Bottomley v. Goldsmith* 36 Mich. 27. Many other cases are to the same effect.

But the question now is, not whether the bank has taken

under suspicious circumstances paper issued by the party whose name it bears, but whether when that party repudiates the paper as issued without authority the bank has made good its claim that the paper was taken under circumstances that justified its officers in believing that it was properly issued. As bearing upon this question the bank gave evidence of the manner in which Wetmore was allowed to conduct the business of the mine; that he was the sole managing officer or agent at the mine, and that he was permitted to issue paper bearing some resemblance to the paper in suit. The bank officers are supposed to have acted in the light of all these facts, as constituting certain indications of Wetmore's authority. But they must also be deemed to have acted in the light of all facts within their knowledge having a contrary tendency, and they had no right to disregard any circumstance known to them which would be calculated to lead a prudent man to suspect that Wetmore might be acting without authority and in fraud of his principal.

Now it would be a bold court that should venture to assert that the offer of a post-dated bill for discount was not in itself a circumstance calculated to arrest attention, or that when purporting to be drawn under a power, it would not tend, any more than any other, to excite suspicion. No one disputes that such paper may be lawfully made, or that it will charge the maker with responsibility, or that it is sometimes negotiated; but when put upon the market it will commonly be for special reasons, and these may or may not be such as the maker would be willing to disclose. A post-dated check, for example, may be made instead of another, because the maker at the time has no funds against which he can draw, but expects to supply them before the date named shall arrive; and a post-dated bill may be issued for the same reason. In either case if the maker were responsible, and had made the check or bill himself, no occasion would appear for questioning the paper, though even then the query would naturally be suggested, why the ordinary form of time paper was not adopted. But we have no reason to believe that any banker to whom paper should be presented for discount by a

third party before the time of its date, would look upon the offer as so far an ordinary occurrence that he would take it with the same promptitude as he would any other paper of equal apparent responsibility, and on the supposition that he had as little occasion to inquire into the circumstances of its issue. But in this case the paper was not only post-dated, but it was issued under a claim of agency, and the question of power was involved. It was the plain duty of a party proposing to take it to take notice of whatever was unusual, either in the form of the paper, or in the accompanying circumstances, which might tend to raise doubts in his own mind whether the authority which was asserted had in fact an existence; and among the most important of these circumstances would be those which indicated that the paper afforded special opportunities for fraud upon the alleged principal. He would not be at liberty to look exclusively at the facts which lead to one conclusion, and to disregard merely suspicious circumstances because in themselves they were inconclusive; for the fact of authority or apparent authority is one to be deduced from all the circumstances, and he must at his peril take them all into consideration.

In this case the bank assumed from certain facts and circumstances that Wetmore was lawfully empowered to draw the disputed bill. These were, that he was a stockholder in the mine; that he was general agent in that locality; that he had undoubted authority to draw time and sight drafts; and we will add the further fact not then known to the officers, that eight years ago when the circumstances of the mine were different, and when it was not reputed, as it was at this time, to have plenty of ready means, Wetmore had drawn some post-dated time drafts which had been paid without dispute. But to set over against these were the following facts: Wetmore for more than a year had been making in the name of his principal paper of an unusual form and to a large amount. The power under which he assumed to make it was one easily abused, and for the existence of which there was not, so far as his principal was concerned, the slightest apparent occasion. In legal effect the paper was time paper, but it was so

made use of and managed that when it went forward for payment, it would appear to be sight paper, and unless the principal was notified to the contrary, it would be accepted and paid as such.    It was therefore deceptive paper, and on the face of the transaction, not an honest reason would be apparent for issuing it, rather than paper of the same legal effect which would tell its own story on its face, and consequently be incapable of the like deception.    Dishonest reasons, on the other hand, might readily be suggested, and a circumstance not previously mentioned might tend to supply these.    Wetmore was then seriously embarrassed in his own affairs; was in great want of money, and had difficulty in meeting his financial necessities.    The bank officers had some knowledge of this fact.    If he drew time paper upon his principal, it might at once be sent forward for acceptance; but whether so sent or not, it would show when presented at what time it was drawn and for what time it had been discounted.    But the discount of post-dated paper which his principal would suppose when payment was made, was issued at the time it bore date, might easily be made to assist him in supplying his own necessities on the credit of his principal, provided it was not prematurely sent forward.    This was not likely to happen; but a request in a particular case that it should not be, could only be explained on the supposition that Wetmore desired his principal to remain in ignorance that the paper was negotiated.    The last bill issued before the discount of the one in suit, was made to take up another post-dated bill, which had never been sent forward at all, but was both made and taken up by Wetmore himself.    Now if Wetmore could legitimately do this once, he could do it any number of times; and he would thus make the power to draw bills equivalent in his hands to the power to make promissory notes, which would be a manifest perversion and abuse of that power.

Then again, the fact of the giving by Wetmore of what he called a "collateral draft" when he thus procured a post-dated draft to be discounted, would seem to indicate that he was conscious that the transaction was not legitimate.    If

Wetmore lived, the post-dated bill would be sent forward for payment when the date was reached, and would appear to Mr. Tilden legitimate, proper and usual. If Wetmore chanced to die, the time paper would be sent forward instead, and would also appear legitimate and proper. But that would be sent forward only after all opportunity for using paper for fraudulent purposes had gone by. If the bank officers had demanded of Wetmore his reason for issuing the principal bill at all when the collateral would have accomplished the ostensible purpose as completely, and would have been the customary and regular paper to give and take, it is probable that his illegitimate transactions would have terminated at the first occasion on which such a "collateral" was offered.

We attach no importance to the evidence which was received to show that the post-dated paper was so common in the Lake Superior region as not to attract special notice. If there is no mistake about the fact, it is certainly remarkable; and if it is exceptional, as it was on the trial assumed to be, it cannot be allowed to affect the rights or liabilities of parties who suppose they are contracting and incurring liabilities only under the general rules of mercantile and banking law. Local usages are allowed to affect these only to a very limited extent, and under circumstances when they must be considered as made by the party a part of his contract. *Mills v. Bk. of U. S.* 11 Wheat. 431; *Jackson v. Henderson* 3 Leigh 196; *Woodruff v. Merchants' Bk.* 25 Wend. 673; *Kilgore v. Bulkley* 14 Conn. 362. A party at New York has a right to suppose that the same rules of commercial prudence, integrity and accountability prevail in Marquette as elsewhere, and that he is subject to no unusual liabilities or contingencies by reason of the paper to which he becomes a party being made at that point.

There is no denying, as we think, that the facts disclosed in the evidence and above recited were suspicious facts, and ought to have been so regarded and to have put the bank officers upon special inquiry regarding the authority which Wetmore assumed to exercise. They were not at liberty to overlook and wholly disregard such facts, as they evidently

did in this case.   We do not say that if Wetmore's authority had been ample, these circumstances would have been sufficient to defeat the paper in the hands of the bank, but they were most cogent evidence on the question of Wetmore's authority, and they so pressed themselves upon the attention when the paper in suit was discounted that they could not fail to be noticed.   But is it true that post-dated drafts are to be considered as so far identical with the customary time drafts, as that authority to draw the one must be deemed to include authority to draw the other?   The circuit judge has answered this question in the affirmative.

It is no doubt the fact that a post-dated draft, purporting to be payable at sight, is for all the legal purposes of presentment, demand, protest and payment, a draft payable a certain time after date.   But in order that authority to make time paper shall be held to cover post-dated paper, their legal effect must not only be the same but all their incidents so far identical that we may fairly suppose both were in mind when the authority was given; for the authority is not to be construed on technical reasoning but by intent.   Is this the case?   Unfortunately judicial decisions throw but little light upon the subject.   In *Forster v. Mackreth*, L. R. 2 Exch. 163, it was decided that authority to draw a check did not authorize drawing a post-dated check, because, "so far as regards its practical effect, a post-dated check is the same thing as a bill of exchange at so many days' date as intervene between the day of delivering the check and the date marked upon it."   And see *Re Brown* 2 Story 502; *Andrew v. Blachly* 11 Ohio St. 89.   But while a bill of exchange is usually allowed days of grace, a post-dated check is not. *Mohawk Bank. v. Broderick* 10 Wend. 304: s. c. 13 Wend. 133; *Salter v. Burt* 20 Wend. 205; *Taylor v. Sip* 30 N. J. 284.   The proposition, therefore, that authority to draw bills would include authority to draw post-dated checks, is one which could not be supported.   The two classes of instruments are similar, but they are not, in legal effect, identical.

But a post-dated bill differs also from a bill payable a corresponding number of days after it is drawn.   It is true that

the question of the right to days of grace might be settled by the terms of the bill itself, but there would be an important difference in this; that the time bill would be subject to be sent forward for acceptance while the post-dated bill would not. The latter must stand upon the responsibility of the drawer until the time of date arrives. It could not be dishonored by refusal to accept it before its date, because the drawer does not undertake to have funds in the drawee's hands to meet it before that day arrives; and the drawee if he were in funds to meet it, could not retain them for the purpose as against other bills drawn and payable before the date arrived. *Godin v. Bank of Commonwealth* 6 Duer 76; *Champion v. Gordon* 70 Penn. St. 474, 476.

Now it is evident that it was precisely this difference between time bills and post-dated bills that Wetmore relied upon in making use of the credit of the New York Iron Mine for his own purposes. It is true that all time bills are not required to be sent forward for acceptance, but any of them may be, and as a matter of prudent precaution and for additional security are liable to be. Wetmore must have known the rules of the law merchant on this subject, and he also knew that for time paper he must eventually account as of the day when it issued. But for post-dated paper he would account only from the time of its date; and if he concealed from the New York parties the fact of its being postdated, he might continue improperly to use the credit of the corporation. But the sending forward for acceptance of a single bill would have exposed his abuse of his trust.

How can we say that authority to draw one paper includes authority to draw another, when the difference between them consists in a particular that peculiarly exposes the principal to be defrauded and plundered? Especially when the one paper is that which is common and customary so that it would naturally be in mind in creating an agency, while the other is altogether exceptional?

But a claim is made by the bank that the mine should be held liable upon this draft because a portion of the proceeds were used by Wetmore to pay its bills. If this were true, it

is probable that the mine might be held liable on any quantity of unauthorized paper which Wetmore saw fit to issue. His evidence shows that he used these proceeds where he should have used moneys he had misappropriated, so that it was rather accidental than otherwise that these particular moneys went to pay demands against the mine. The fact remains, however, that the draft was drawn to aid a misappropriation, and the question of liability upon it is purely a question of authority to make it. We think the court erred in its rulings bearing upon the question of authority.

The judgment must be reversed with costs and a new trial ordered.

The other Justices concurred.