## WENDAL A. MACE v. ROLAND D. KENNEDY.

*Bills and notes—Bona fide holder—Burden of proof—Fraudulent representations—Charge to jury—Bohemian oat contract.*

| | |
|---|---|
| 68 | 389 |
| 77 | 491 |
| 68 | 389 |
| 90 | 123 |
| 68 | 389 |
| 101 | 385 |
| 68 | 389 |
| 114 | 42 |
| 68 | 389 |
| s36NW | 187 |
| e132 | 5643 |
| 68 | 389 |
| 141 | 4183 |
| 68 | 389 |
| f155 | 5365 |

1. Where the maker of a promissory note, in a suit by an alleged innocent holder, sought to avoid payment on the ground that the note was fraudulently obtained, and gave evidence upon his direct examination of the circumstances of the transaction, and was cross-examined upon the facts occurring at the time the note and an accompanying bond were given, he may be further asked to *specifically* point out the *circumstances* or *facts* which constituted the alleged fraud, such inquiry not calling for the *opinion* of the witness upon the *facts*, but for a statement of *what* facts operated upon his mind and produced the fraud complained of.

2. Collateral inquiries into the reputation and business of persons not parties to a suit are not desirable or permissible.

   So *held*, where in a suit upon a note claimed to have been fraudulently obtained the defendant was permitted to show the fraudulent character of *other* notes obtained from *other* parties in the same manner, and their transfer to th rd parties, and some of them to the plaintiff, *before due*, and the plaintiff was allowed, on the cross-examination of a witness who had testified to such transfer to a particular person, to show that such purchaser was a reputable citizen, and engaged in the business of buying notes generally.

3. Where, in a suit upon a promissory note by an alleged innocent holder, the defendant claimed that the *purchase of that and other* notes of *like* character *was in itself* a badge of fraud and part of a scheme to defraud the community *generally*, the plaintiff may show that there was no talk or thought of fraud abroad in the community at the time the notes were bought, and that the enterprise or scheme seemed only fraught with good results to all who participated in it.

4. To defeat a recovery by the holder of a promissory note purchased before maturity, he must be shown to have had knowledge of such facts and circumstances as would make his taking the paper with the intention of enforcing it an act of bad faith. *N. Y. Iron Mine v. Citizens' Bank*, 44 Mich. 352.

5. After proof that a promissory note, transferred before maturity, was fraudulently obtained of the maker, the burden of proof is

upon the transferee to show that he is a *bona fide* holder for value.

6. Where, in a suit by an alleged *bona fide* holder for value of a promissory note transferred before maturity, the defendant relies upon distinct false representations made in obtaining said note, *each* of which is set forth in a request for an instruction to the jury that, if they find that *such* false representation was made, the plaintiff cannot recover unless shown to be a *bona fide* holder for value, it is error to refuse to give such *several* instructions, which is not cured by bunching the three propositions together so that the jury might believe that they must find *all* of the alleged misrepresentations to have been made in order to throw the burden of proof upon the plaintiff on this branch of the case.

Error to Lenawee. (Howell, J.) Argued January 5, 1888. Decided February 2, 1888.

Assumpsit. Defendant brings error. Reversed. The facts are stated in the opinion.

*Bean & Lane,* for appellant.

*Watts & Smith,* for plaintiff.

MORSE, J. The plaintiff in this suit is the holder of a promissory note for $200, which was obtained in the same manner, for Bohemian oats, as the note in the case of *Sutton v. Beckwith, ante,* 303. A bond similar to the one in that case was executed and delivered to the defendant, the maker of the note, at the time the note was given.

The main question at issue upon the trial was the good faith of the plaintiff, who purchased the note before due, and for value.

The note was executed by defendant December 5, 1884, and delivered to one James Armitage. The note was made payable to R. N. Sims, or bearer, 15 months from date. The bond purported to be given by the Crawford, Henry, and Williams County Bohemian Oat Association, and signed by

its superintendent, O. H. Brassington. No time was assigned in which the bond was to be performed, but it provided that the note given by defendant would not be called for until 100 bushels of Bohemian oats were sold by the association for defendant at $10 per bushel.

Armitage sold the note about one month after its date to Frederick Sims for $180 cash. Frederick Sims is a brother of the payee named in the note. Frederick Sims sold it to plaintiff about January 3 or 4, 1886, two months before it fell due, for $192 cash.

The defendant claimed that both Frederick Sims and the plaintiff had notice and knowledge of how this note was obtained, and of the bond executed at the same time.

The defendant testified that he first talked about taking the oats with R. N. Sims, afterwards with R. N. Sims and Armitage together; but he completed the arrangement with Armitage, who drew up the note and filled out the bond. R. N. Sims was to deliver the oats,—20 bushels. The oats were delivered to him. Afterwards he took ten bushels more of the oats, and the bond, which was first drawn agreeing to sell 60 bushels for him, was changed to 100 bushels, by Armitage. At that time defendant gave another note for $100. No one ever offered to sell any oats for him. Armitage represented to him that the association had an office at Napoleon, Ohio, where it was located, and had its headquarters. He represented it to be an incorporated company, and perfectly reliable, having $150,000 deposited in a bank there. Subsequently defendant went to Napoleon, and found the association had no general office there where they did business.

He testified that he was influenced to go into this transaction by the fact that R. N. Sims told him that he had bought the oats the year before, and sold the oats he raised, and did well on them. Defendant also testified that he took the oats, and gave his note, because he supposed the associa-

tion would perform its agreement, and sell the 100 bushels of oats for him at $10 per bushel.

Testimony was also given tending to show that no such asssociation was incorporated in Ohio.

The defendant introduced considerable evidence of other transactions similar to his own, where notes were procured from others by Armitage and one Warner, who was connected with him, and similar bonds given back to the makers of the notes, and that all these notes were sold before due, and without reference to the agreement in the bonds, which was never fulfilled. It was shown that several of these notes were so purchased by Fred Sims, and also by the plaintiff, Mace. It was sought to be inferred, from these purchases of Sims and plaintiff, that they knew of the fraud, and participated in it. Testimony was also given in one instance that Fred Sims was in the room when the note and bond were executed. The note in that case was made payable to one Alex McUabe or bearer, but it was delivered to Warner, who passed it over, while in the room, to Fred Sims, who then paid $50 to Warner upon it. The bond was read while Sims was present. There was some other evidence tending to show that Fred Sims and Mace were both acquainted with the business that Armitage and Warner were engaged in, and knew these notes, including the one in suit, were given for Bohemian oats.

Fred Sims was sworn as a witness on the behalf of the plaintiff, and testified that at the time he bought this note made by the defendant, and at the time he sold it to plaintiff, he did not know of any charge of fraud in connection with these notes, in any shape or manner; that he purchased and sold it in perfect good faith. The plaintiff also testified that he bought the note in good faith, paying $192 in cash for it; and that he never saw the bond until the day of the trial of this suit in justice's court, where the case was commenced. He admitted buying five or six of these notes of Fred Sims,

and it also appears from his own testimony, clearly enough, that he knew the note in suit was given for Bohemian oats.

The plaintiff had judgment in the court below for the full amount of the note and interest, and the defendant brings error.

There are 18 assignments in relation to the admission or rejection of testimony upon the trial, but several of them were formally waived upon the argument.

Upon the cross-examination of the defendant, and also of one Hawley, who had given a note under similar circumstances as the defendant, these questions were asked respectively: "Now, will you tell me just where the fraud is?" and "Whereabouts was the fraud?" Both of the witnesses were claiming fraud in the obtaining of their notes, and had given evidence upon the direct examination of the circumstances of the transaction. After being cross-examined upon the facts occurring at the time the notes and bonds were made, and the non-performance of the agreement in the bond, they were asked, in effect, by these questions, to specifically point out the circumstances or facts which constituted the fraud claimed. The object of these questions may have been to bring out by their answers the real motive which actuated them in giving the notes, the fact or promise which they relied upon, and which was the inducement to the making of the notes.

The objection to the question is that it called upon the witness to draw a conclusion from the facts. We do not think the question open to this objection. The witness was not asked to give his opinion upon the facts, but to state what facts operated upon his mind and produced the fraud, —in what part of the transaction and by what acts he was misled and defrauded. We cannot see what possible harm could result to the defendant by this inquiry.

Under the theory of the defendant as before stated, that this was a preconcerted swindle, and that several men were

engaged in it, who, as soon as possible after procuring the notes, put them into the hands of third persons, and that among these third parties were Fred Sims and the plaintiff, he introduced testimony of one Dennison, who had given a similar note to defendant's, which note was found, before due, in the hands of one Elisha Baker.

The theory of the defendant, upon the trial, as tending to implicate Sims and plaintiff in the fraud, was broad enough to also cast suspicion upon all persons in whose possession the notes were found before due.

Plaintiff's counsel, on cross-examination, inquired of the witness as follows:

"Q. Elisha Baker (referring to one to whom the note given by witness had been transferred) is an old citizen there in Morenci, and has lived there a good many years?

"A. Yes, sir.

"Q. You have known him a good many years?

"A. Yes, sir.

"Q. Ever since you were a boy?

"A. Yes, sir.

"Q. He is a very reputable old gentleman, is he not?

"A. I have considered him so.

"Q. He is a moneyed man, and buys notes?

"A. Yes, sir.

"Q. And makes that his business?

"A. Yes, sir."

To which testimony so given counsel for the defendant objected as incompetent and immaterial, and moved to strike it out. The motion was overruled by the court, and defendant excepted.

The plaintiff's counsel claim that when the defendant was permitted to show the fraudulent character of the notes obtained by Armitage and Warner from others than himself, and the passing of such notes into the hands of third parties, before due, and some of them into the hands of Sims and the plaintiff, for the purpose of establishing bad faith on the part of Sims and plaintiff, the bad faith of other parties who bought such notes was also involved; and that, when a wit-

ness for the defendant, under this theory, named a person as the purchaser of his note, the plaintiff had a right, upon cross-examination, to show that such purchaser was a reputable citizen, and engaged in the business of buying notes generally, to rebut such presumption or claim of bad faith.

The trouble with this claim is that such a course of procedure would raise a score or more of collateral inquiries into the reputation and business of persons not parties to the suit, which is not desirable or permissible. The court erred in allowing this cross-examination, and in not striking out the testimony.

The theory of the plaintiff was that at the time these notes were purchased by Sims, the plaintiff, and others, there was no hint or talk of fraud in the community in regard to these notes. This was legitimate to rebut the presumption raised by the defendant that the dealing in these notes was fraudulent, or done with notice of the fraudulent character of the transactions. To support this theory, it was shown that the first year of the operation of this pretended association in Lenawee county the bonds were performed, and everybody connected with the scheme seemed to be making money, and no one was the loser apparently. A banquet and dance was given, at which the promoters and patrons of the swindle joined together in the festivities, and all "went merry as a marriage bell."

But along in January or February, 1886, a suspicion of fraud began to creep though the community, which was soon made a certainty by the non-performance of the bonds.

H. E. Green was one of the persons shown by the defendant to have purchased some of these notes. The plaintiff called him as a witness in rebuttal, and after showing by him that he was a hardware dealer, and sometimes bought notes, asked him if, in the winter of 1885 and the spring and summer of 1886, he bought any Bohemian oat notes. This was objected to as incompetent, irrelevant, and immaterial. The

objection was overruled, and the witness permitted to answer. He was also asked if he knew, at the time he bought them, that they were Bohemian oat notes. The same objection was made to this question.

Upon an inquiry from the court, the plaintiff's counsel stated the object of the question as follows:

"What I want to prove by this witness and other witnesses is that during the winter of 1884 and '85, and clear down to March, 1886, there was nothing talked against this business in that community; that it was not agitated in that community at all that there was anything corrupt about this business, or that there was anything illegal about it, or anything fraudulent about it, but that the general speech of people in that community was that it was a legitimate business; and hence when a Bohemian oat note was offered upon the market, there was nothing whatever required of the purchaser, any more than in the purchase of any other note."

The witness, upon this showing, was allowed to proceed, and testified that he had reason to believe part of them were Bohemian oat notes, but did not make any inquiry, as he remembers, and that the first talk that he heard in the community about there being anything wrong in the Bohemian oat business was in February or March, 1886.

The admission of this testimony is assigned as error. We think that, the defendant having first introduced testimony that Green had purchased some of these notes, it was competent for the plaintiff to show the same thing by him; and, considering the respective theories of the defendant and plaintiff as to the purchase of Bohemian oat notes before they were due, the whole of his evidence, as above stated, was admissible.

The defendant could not well claim that the buying of these notes was in itself a badge of fraud, and at the same time deny to the plaintiff the right to show that there was no talk or thought of fraud abroad in the community where these dealings were going on, at the time the notes were bought, and that the enterprise or scheme seemed only

fraught with good results to all who participated in it; for, strange as it may seem, not only in this, but in other communities, apparently intelligent and well-disposed men were led to believe for months that the business was not only profitable to all concerned, but entirely honest and legitimate as a business venture.

But we think the circuit judge committed a grievous error in his charge to the jury. It is true that in the first part of his instructions he stated that, if they found that the note was obtained from the defendant by fraud, then, in order to recover, the burden of proof was upon the plaintiff to show by a fair preponderance of evidence that either he or Frederick Sims bought the note in good faith, before due, and paid a valuable consideration therefor, without any knowledge of such facts or circumstances as would put a man of ordinary care and prudence upon inquiry as to whether the note was procured by fraud or not. This was more favorable to the defendant than the law as laid down by this Court would permit, as it has been held that something more than this is needed. The holder must have knowledge of such facts and circumstances as would make his taking the paper with the intention of enforcing it an act of bad faith. *N. Y. Iron Mine v. Citizens' Bank*, 44 Mich. 352 (6 N. W. Rep. 823), and cases there cited.

But later on, in speaking of fraud, he said:

" The charge of fraud and bad faith in the purchase of the note in question, alleged against Mr. Mace and also against Frederick Sims, is a serious and severe charge, and to make it avail it must be proven clearly, like any other fact in the case. If the jury believe from the evidence that Mr. Mace and Frederick Sims, or either of them, purchased this note in good faith, and for a valuable consideration, before it was due, then the plaintiff would be entitled to recover; and to defeat such recovery, by means of the charge of fraud and bad faith made by the defendant against Mr. Mace and Frederick Sims, in the purchase of this note, the alleged fraud must be proved by evidence so convincing, and of such

a species, as to leave a very hearty and firm belief of the fact.

"It is not sufficient that the evidence to prove such fraud leaves the mind in perplexity, or generates mere doubt or suspicion of the good faith of Mr. Mace and Frederick Sims. The party charging fraud and bad faith is not entitled to any benefit from such charge unless his proof carries a clear and full impression that the charge is true. Fraud cannot be presumed; it must be proved. When there is nothing on the face of a note to cause suspicion of its character, it can only be impeached or defeated, in the hands of a holder for value, by evidence that he took it under such circumstances as rendered him guilty of bad faith. The proof must show in such a case that the holder for value, who takes the note with no ear-marks of fraud or illegality, has had notice of such fraud or other defense to the note, so that he cannot honestly take the paper without further inquiry. The facts of which he must have knowledge or notice must be such as go to defect of title."

Here, by this portion of the charge, the burden of proof was thrown upon the defendant to establish the fact that neither Sims nor the plaintiff were good-faith holders of the note.

There was certainly evidence in the case tending to show that the inception of the note was fraudulent, and that its consideration was the promise in a bond which was a part of the contract, and a promise which was never meant to be fulfilled. It was sought to be shown by the defendant, by various facts tending in that direction, that both Sims and the plaintiff were parties to the fraud. If parties to the fraud, they could not be good-faith holders of the note. The burden of proof being upon them, after the fraudulent inception of the note was shown, to establish that they were good-faith holders without notice of the fraud, if the minds of the jury were left by the whole evidence in "perplexity," or if "doubt or suspicion were generated" in their minds as to the good faith of Sims and the plaintiff, such perplexity, doubt, and suspicion were sufficient to prevent the recovery of the plaintiff. The jury must find, by a preponderance of the testimony, that one of them purchased the note

without knowledge of the fraud. This they could not do if their minds were in a perplexity. If they could not say that they were satisfied of this good faith, and want of knowledge of the fraud,—if their minds were equally balanced upon the subject,—the defendant was entitled to their verdict in his favor.

To instruct the jury that the charge of fraud and bad faith against Sims and the plaintiff in the purchase of the note "must be proved by evidence so convincing, and of such a species, as to leave a very hearty and firm belief of the fraud," put the *onus* upon the defendant, when it should have rested upon the plaintiff.

The defendant was also entitled to his fifth, sixth, and seventh requests, as follows:

" 5. If you find that at the time the note in question was procured from defendant it was represented to him that the Crawford, Henry, and Williams County Bohemian Oat Association was a corporation having its principal office and headquarters at Napoleon, in the state of Ohio, and the defendant, relying upon the truth of such representations, gave the note, and would not have given it but for such representations, and such representations were false, then the note was fraudulently procured, and plaintiff cannot recover, unless he shows himself or Fred Sims to be a *bona fide* holder for value.

" 6. If you find that at the time the note in question was procured from defendant it was represented to him that the Crawford, Henry, and Williams County Bohemian Oat Association was thoroughly responsible, and had $150,000 deposited as security for the performance of the contracts made by it, and defendant relied upon such representations, and would not have given the note in question but for such representations, and such representations were false, then the note was fraudulently procured, and plaintiff cannot recover here, unless he shows himself or Fred Sims to be a *bona fide* holder for value.

" 7. If you find that at the time the note in question was procured it was represented to defendant that the Crawford, Henry, and Williams County Bohemian Oat Association was incorporated, and defendant relied upon such representation, and would not have given such note but for such representa-

tion, and the same was false, then the note was fraudulently procured, and the plaintiff cannot recover here, unless he has shown himself or Fred Sims to be a *bona fide* holder of the same for value."

The defendant had the right to rely upon each of these propositions standing alone, so that, if the jury found that any one of the false representations were made, it would place the burden upon plaintiff to show that either He or Fred Sims was a *bona fide* holder for value.

The court evidently intended to give the substance of these requests in his general charge, but he bunched the three propositions together so that the instructions, as given, were open to the charge that the jury might have been led to the belief that they must find all of the misrepresentations to have been made in order to throw the burden of good faith upon the plaintiff.

The court also instructed the jury—

"If the purchaser of the note was informed that a bond had been given by the oat association to the maker of the note, that, of itself, would not charge the purchaser of the note with knowledge of the contents and provisions of the bond, or require him to make inquiry about it."

This instruction was incorrect. The bond and note constituted one contract. See *Sutton v. Backwith, ante*, 310, and cases there cited. If the purchaser of the note was informed that, at the time the note was executed, a bond was given back to the maker, and that such bond was connected with the note, it was his duty to make inquiry and ascertain what the bond contained; in other words, to find out what the contract was that he was buying. He could not shut his eyes to the fact that the note did not, in all probability, contain all the terms and conditions of the agreement between the maker and the payee. It would be the same as if the purchaser of a note before due should be informed that since the execution of the same some agreement or stipulation that

might qualify its conditions had been cut off or detached from the same. In such case, the purchaser could not, without further inquiry, become a good-faith holder of the note.

For the errors herein noted the judgment of the court below must be reversed, with costs, and a new trial granted.

CHAMPLIN and LONG, JJ., concurred with MORSE, J.,

SHERWOOD, C. J. I concur in the result.

CAMPBELL, J., did not sit.