GLINES *v.* STATE SAVINGS BANK.

1. BANKS—INSOLVENCY—DEPOSITORS—MALA FIDES.

Circumstances sufficient to put a prudent man on inquiry are insufficient to charge a bank with knowledge that a check deposited in the usual course of business by another bank was received by the latter when insolvent; there must be such evidence as to show bad faith.

2. SAME—DIRECTING VERDICT.

Where, in an action by the depositor of a check in an insolvent bank against a bank which had received it from the former bank, and paid out its proceeds on checks, there was no evidence that defendant did not act in good faith, a verdict should have been directed for defendant.

Error to Wayne; Frazer, J. Submitted February 5, 1903. (Docket No. 72.) Decided April 7, 1903.

*Assumpsit* by Walter C. Glines against the State Savings Bank of Detroit for money had and received. From a judgment for plaintiff, defendant brings error. Reversed.

The plaintiff had been a commercial depositor for from 12 to 16 years in the bank of A. Ives & Sons of Detroit. On Saturday, September 8, 1900, he deposited in said bank a check for $300 drawn upon Fleischmann & Co., of Cincinnati, Ohio. He received credit for this amount on the bank's books and on his own deposit book. The deposit was made in the customary manner, and he drew out none of its proceeds. A. Ives & Sons kept a depositor's commercial account with the defendant, which they had opened in May preceding. On the same September 8th, this check, with other items amounting to several thousand dollars, was deposited in the defendant's bank, and due credit given therefor as cash. On the same day the entire amount was paid out on checks issued by A. Ives & Sons,

except one, which was certified, and, on the following Monday, charged up to their account. On that day, September 10th, A. Ives & Sons opened their bank for business as usual. On said 10th of September they made another deposit with defendant, and drew out all but $30.40.

On Friday, the 7th, or Saturday, the 8th, of September, two checks, aggregating $11,000, had been presented to A. Ives & Sons for payment, and payment refused for lack of cash on hand sufficient to pay them. These checks were held by the First National Bank of Detroit. For some time prior to May 1, 1900, the bank of A. Ives & Sons had been a member of the clearing house, of which the defendant was also a member. A. Ives & Sons then withdrew from the clearing house, borrowed $25,000 of the defendant on a real-estate mortgage executed by Albert Ives, a member of the firm, and deposited the same in the defendant's bank. On August 1, 1900, they borrowed $10,000 more from the defendant upon their note, secured by business paper of their customers, aggregating $23,940, and this also was deposited in defendant's bank. Both were ordinary commercial deposits, and were drawn against in the usual manner. On the afternoon of September 8th, after banking hours, A. Ives & Sons and the First National Bank entered into an agreement reciting the holding by said national bank of the two checks above mentioned, and providing:

" *Whereas*, the State Savings Bank of Detroit holds and is in possession of certain notes to the aggregate amount of $23,940, of which a list, showing the date, the name of the maker, the due date, and the amount of each of said notes, is hereto attached and made a part hereof, marked 'Schedule A,' which notes are held by the said State Savings Bank as collateral security for the payment of certain indebtedness and liabilities of the said A. Ives & Sons:

" Now, therefore, said A. Ives & Sons, being desirous of securing payment of the said checks held by the said First National Bank, in consideration of the premises, and of the

agreement of the second party to hold said checks and to forbear presentation thereof five days after the date of this instrument, hereby assign, transfer, and set over to the said First National Bank, trustee, subject to the rights of said State Savings Bank therein, all their right, title, and interest of, in, and to the said notes held by the said State, Savings Bank as collateral, and described in the said schedule, and all renewals heretofore or hereafter made thereof.''

This agreement was carried out, and the defendant, after paying itself the loan of $10,000, turned over the remainder of the collateral to the First National Bank.

A. Ives & Sons kept their bank open about two hours on Monday, September 10th, then closed its doors, and went into voluntary bankruptcy.

After the withdrawal of Ives & Sons from the clearing house, the First National Bank required the certification of the checks of Ives & Sons given in payment of items drawn on them coming through the First National Bank. This was in pursuance of a general rule by which that bank required the certification of all checks given in payment of items which it received against any one not a member of the clearing house. Numerous checks drawn by Ives & Sons on the State Savings Bank during the months of August and September were put in evidence, including a few drawn in favor of the First National Bank, and a considerable number in favor of other banks of Detroit. Of these, the First National Bank checks were certified, as well as a few others, but a large proportion of the checks drawn in favor of the Detroit banks were uncertified. Certain of these certified checks were dated in August, 1900. As to these, the cashier of the First National Bank testified:

'' The reason these checks were certified was that they were given in payment of checks that were put in our bank by depositors upon which we had a claim, which was surrendered when we delivered the checks to Ives. We would not surrender them to any bank and release the claim that we had against those checks without a certified check or the cash. It wouldn't make any difference who

it was, whether a member of the clearing house or not, and it was in conformity with that custom or requirement these checks were certified."

After such withdrawal, checks upon A. Ives & Sons were presented at their own bank, and were paid in cash or in checks on the defendant, the larger checks being usually paid by checks upon the defendant. As to the reason for withdrawing from the clearing house, Albert Ives testified: "I suppose we left the clearing house because it was expensive, and we could get along cheaper." Butler Ives testified:

"We went out of the clearing house because I did not like its methods. I had been fighting it for a number of years. We made weekly statements, and I think the only other statement made was an annual one. The chairman of the clearing house called on us for a detailed statement of our bills receivable, and in our statement to the house we showed a balance of about $200,000. This was made up of bills receivable on hand, cash, bank accounts, and general items. The clearing house committee called on us for a detailed statement of our bills receivable, and I objected to it. As things have turned out, all of this $200,000 was not good, but we supposed then most of it was."

The cashier of the First National Bank testified that he did not know why Ives & Sons left the clearing house, and that he thought it was entirely voluntary.

It is conceded that the bank of A. Ives & Sons was insolvent on September 8th, and had been for some months previous. Both Albert and Butler Ives testified that they then believed that they were solvent.

On hearing of the failure of A. Ives & Sons, plaintiff telegraphed to Fleischmann & Co. to stop payment. The check was protested, but was subsequently paid to defendant. Plaintiff made demand upon defendant for payment of the money received on the check, which was refused, and this suit was then brought. The defendant introduced no testimony. The court submitted the case to the jury under the following instructions:

"I charge you that if, at the time this draft was received by Ives & Sons, they knew of their condition, of their inability to pay it, if at that time they were bankrupt, and knew it, and took that money under those circumstances, it was a fraud upon the part of Ives & Sons as against Glines, the plaintiff, and that he would be entitled to recover from them that money, or the proceeds of that draft, on account of such fraud as that having been perpetrated upon him by Ives & Sons.

"It appears that this check or draft, whatever it was, was deposited by Ives & Sons with the State Savings Bank, and that they received it as a deposit from Ives & Sons, and became the custodians of that draft. Now, they had a perfect right to receive this draft, if they received it in good faith, without knowledge, or without circumstances coming to their knowledge that would put them upon inquiry, as to the condition of Ives & Sons' Bank; that is, that they had not such knowledge that would put a reasonable man on his guard as to the condition of the bank, or the fraud that had been perpetrated by Ives & Sons, if you shall believe a fraud had been perpetrated. If they were *bona fide* holders of this draft, if they did not know this condition, or if there were not facts and circumstances brought to their knowledge that should put a reasonable man upon inquiry as to whether a fraud of this kind had been perpetrated or not, then they would be entitled to hold that check and to have the proceeds of it, because then they would be entirely innocent of any wrongdoing or fraud in the matter; and if they are not parties to, and did not have knowledge of, or were not possessed of such facts as would put a reasonable man upon his inquiry as to, this fraud, then the verdict in this case ought to be for the State Savings Bank, and not for the plaintiff in this suit. But if they did know of this fraud, or were parties to it, or were in possession of such facts as would put them fairly upon their inquiry in regard to the condition of this bank or the perpetration of this fraud, and they took it with that knowledge, then they would hold it under no better or stronger circumstances than Ives & Sons would; and that is the whole question for you to determine in this matter."

Plaintiff recovered verdict and judgment.

*Walker & Spalding*, for appellant.

*A. F. Wilcox*, for appellee.

GRANT, J. (*after stating the facts*).    A. Ives & Sons
were in fact insolvent.    Plaintiff received no consideration
from them for the transfer and deposit of the check.
Whether they knew, or should have known, that they
were insolvent, or whether they had no reasonable ground
for expecting to repay the plaintiff, it is not necessary to
determine.    We will dispose of the case upon the question
whether there is any evidence in the record to hold the
defendant liable on the ground that it had knowledge of
such facts as to show it to have been a *mala fide* pur-
chaser of the check.

Checks are deposited as cash, pass current as cash, the
amount thereof paid out by the bank as cash, and the
same check is often used to liquidate several debts.    Often-
times the holder of a check obtains cash for it from a bank
instead of depositing it.

Plaintiff seeks to hold the defendant liable under *Mace
v. Kennedy*, 68 Mich. 389 (36 N. W. 187), and *Goodrich v.
McDonald*, 77 Mich. 486 (43 N. W. 1019).    Those were
cases of fraud in the execution of promissory notes.    They
recognize the rule that whenever a note is based upon
fraud, or is void as between the original parties, the burden
of proof is then upon the holder to show himself to be a
purchaser in good faith.    These same cases, however, and
many others, recognize the rule that, where there is nothing
upon the face of the promissory note to cast suspicion
upon it, it is valid in the hands of a holder for value,
without evidence that he took it under circumstances
which render him guilty of bad faith.    It is not enough
that the circumstances be suspicious, or sufficient to put a
prudent man upon inquiry; they must be such as to show
*mala fides* on his part.    *Stevens v. McLachlan*, 120
Mich. 285 (79 N. W. 627), and authorities there cited;
*Davis v. Seeley*, 71 Mich. 209 (38 N. W. 901).

The fact that one of the firm of A. Ives & Sons borrowed
money of the defendant, and gave security for it, is no
evidence of insolvency or of bad faith.    Neither was it a
circumstance sufficient to put the defendant upon inquiry.

As the circuit judge very tersely said in his instructions to the jury, "It was evidence of good common sense, and no evidence of fraud." The fact that A. Ives & Sons had withdrawn from the clearing house, if known to the defendant, as it probably was, is no evidence of fraud, or of the insolvency of Ives & Sons. The custom of the First National Bank, and, in some instances, of some other banks, to require certified checks, constituted no notice to the defendant that Ives & Sons were insolvent, that they were engaging in fraudulent transactions, and that the paper received from them was liable to be tainted with fraud. The business in these banks had for months been done in the usual manner,—A. Ives & Sons making deposits and checking out. There is no evidence whatever to indicate that the defendant did not act in the utmost good faith. It had no notice that the plaintiff was a depositor at the bank of Ives & Sons, or whether the check had been deposited or had been cashed. It was conclusively proven by plaintiff's own witnesses that this check was deposited as cash with the defendant in the usual course of business; that on the same day the defendant paid out its proceeds on A. Ives & Sons' checks; that it then forwarded it for payment; and that it made no profit whatever by the transaction. These facts fully satisfied the law which casts the burden of proof upon the holder of commercial paper tainted with fraud to show good faith, and it was the duty of the circuit judge to direct a verdict for the defendant. See *Fredonia Nat. Bank* v. *Tommei*, 131 Mich. 674 (92 N. W. 348).

This disposal of the case renders it unnecessary to discuss any other questions.

Judgment reversed, and new trial ordered.

The other Justices concurred.